**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| ROSEANN M. FOXWELL, | ) | CASE NO.  3:10-cv-1002 |
| | ) | |
| Plaintiff, | ) | JUDGE CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Roseann M. Foxwell ("Plaintiff"), challenges the final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"),

denying Plaintiff's applications for a Period of Disability ("POD") and Disability Insurance

Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of

the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report and Recommendation.  For the reasons set forth below, the

Magistrate Judge recommends that the Commissioner's final decision be REVERSED

and this case be REMANDED for further proceedings consistent with this report and

recommendation.

## I.  PROCEDURAL HISTORY

On April 27, 2005, Plaintiff filed applications for DIB and SSI.  (Tr. 10.)  In both applications, Plaintiff alleged a disability onset date of February 24, 2004.  (Tr. 10.) Both applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  On October 10, 2007, an ALJ held Plaintiff's hearing by video conference.  (Tr. 10.)  Plaintiff appeared at her hearing, was represented by an attorney, and testified.  (Tr. 10.)  During the hearing, Plaintiff amended her disability onset date to November 1, 2004.  (Tr. 10.)

On April 8, 2008, the ALJ decided that Plaintiff was not disabled.  (Tr. 23.)  On March 5, 2010, the Appeals Council notified Plaintiff that it declined to review the ALJ's decision; therefore, the ALJ's decision became the Commissioner's final decision.  (Tr. 2.)  On March 5, 2010, Plaintiff timely filed this cause of action in this Court to challenge the Commissioner's final decision.  (Doc. No. 1.)

Plaintiff asserts five assignments of error:

1.  The ALJ erroneously found that Plaintiff could perform her past relevant work as a factory crew leader;

2.  The ALJ failed to find that Plaintiff's carpal tunnel syndrome was a "severe impairment" at Step Two of his analysis;

3.  The ALJ failed to incorporate the environmental limitations found by state agency reviewing physicians in their residual functional capacity ("RFC") assessments;

4.  The ALJ failed to give proper weight to two of Plaintiff's treating physicians and incorporate their opinions into Plaintiff's RFC; and

5.  Evidence submitted for the first time to the Appeals Council warrants remand pursuant to sentence six of 42 U.S.C. § 405(g).

2

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was forty-six years old on her amended alleged onset date, and fifty years old on the date of the ALJ's decision.  (*See* Tr. 27, 23, 30, 339.)  She completed the eleventh grade of high school and did not obtain a graduate equivalency degree ("GED").  (Tr. 339.)  The ALJ found that Plaintiff had past relevant work as a "crew leader" at a factory.  (Tr. 23; *see* Tr. 81-82.)

### B.    Medical Evidence

Throughout 2003, Plaintiff presented to the Community Care Clinic for medical treatment primarily of pain and swelling in her left ankle.  (Tr. 287, 292-93, 295, 299, 301-04, 306, 308.)  On March 28, 2003, Plaintiff underwent x-rays of her left foot upon the request of Dr. Richard Paat, M.D.  (Tr. 306.)  Dr. Haitham M. Elsamaloty, M.D., attended the x-ray examination and interpreted the results.  (Tr. 306.)  Dr. Elsamaloty reported that Plaintiff had a history of cellulitis, and Dr. Elsamaloty's impression was that the soft tissue swelling over Plaintiff's left ankle might represent focal cellulitis.  (Tr. 306.)

In April and May 2003, Plaintiff presented to the Community Care Clinic with complaints of pain and swelling in her left ankle that extended to her left knee.  (Tr. 297-99.)  On May 18, 2003, Dr. A. Wilker, M.D., referred Plaintiff for a neurological examination.  (Tr. 298.)

On May 28, 2003, Plaintiff presented to the Medical College of Ohio, Department of Neurology, with a chief complaint of left leg pain and swelling.  (Tr. 308.)  Neurology resident Dr. Marietta Medel, M.D., evaluated Plaintiff and reported the following.

3

Plaintiff had a history of cellulitis.  (Tr. 308.)  Plaintiff reported that a bout of cellulitis

flared up within the past year; the condition was aggravated by the standing that was

required at her factory job; and the pain and swelling caused Plaintiff to quit her job.

(Tr. 308.)  Plaintiff also was diagnosed with asthma fifteen years prior, although Plaintiff

reported that she continued to smoke a pack of cigarettes a day.  (Tr. 308.)  Dr. Medel's

evaluation of Plaintiff was essentially unremarkable; Dr. Medel doubted that Plaintiff's

left ankle and leg pain was neurological and recommended that Plaintiff see an

orthopedic or podiatry consultant.  (Tr. 309-10.)  Dr. Boyd Koffman, M.D., Ph.D.,

oversaw Dr. Medel's evaluation and confirmed Dr. Medel's impression.  (Tr. 310.)

Throughout the rest of 2003, Plaintiff continued to present to the Community

Care Clinic with complaints of left leg pain.  (Tr. 287-95.)  Plaintiff also complained of

wheezing because she ran out of her Albuterol asthma medication.  (Tr. 292.)  Plaintiff

was told that she should quit smoking.[1]  (Tr. 293.)

The record does not appear to contain evidence of medical treatment throughout

2004.

On January 17, 2005, Plaintiff presented to Dr. Theodore J. Ware, M.D., at St.

Vincent Mercy Medical Center as a new patient.  (Tr. 249.)  Plaintiff complained of low

back, knee, and ankle pain that worsened when she walked.  (Tr. 249.)  Dr. Ware

reported that Plaintiff was morbidly obese, and that Plaintiff reported she had asthma,

could not afford asthma medication, and continued to smoke.  (Tr. 249-50.)  Dr. Ware

prescribed Plaintiff Mobic, referred Plaintiff for x-rays, and told Plaintiff to stop smoking.

---

[1] The record does not clearly indicate who examined or treated Plaintiff and gave
this advice on this occasion, as the signatures in the record are illegible.

(Tr. 250.)

On February 17, 2005, Plaintiff underwent x-rays of her knees and ankles.  (Tr. 244-45.)  The results showed that there were no acute abnormalities or joint effusion in either knee, and no acute bone or joint space abnormalities in either ankle; but there were spurs in both knees and ankles, and Plaintiff's left ankle appeared to have "very slight soft tissue swelling over the lateral malleolus."  (Tr. 244-45.)

On March 17, 2005, Dr. Ware confirmed that Plaintiff had spurs in her knees and ankles and reported that an x-ray of Plaintiff's spine indicated mild scoliosis.  (Tr. 251.)  Dr. Ware also indicated that Plaintiff reported that the Mobic medication that Dr. Ware prescribed "helped very little."  (Tr. 251.)  Dr. Ware gave Plaintiff samples of Celebrex and referred Plaintiff for an orthopedic evaluation.  (Tr. 251.)

On May 6, 2005, Plaintiff presented to the Emergency Department at St. Anne Mercy Hospital with a complaint of back pain.  (Tr. 241.)  Dr. Asok Sinha, M.D., examined Plaintiff and reported the following.  Plaintiff reported that she had a history of chronic back pain, ankle pain, and asthma; and that she ran out of her Tylenol and Celebrex medication.  (Tr. 241.)  Dr. Sinha gave Plaintiff a limited quantity of Darvocet and Flexeril and told Plaintiff to follow up with her own physician (or the ER, if necessary).  (Tr. 241.)

On May 16, 2005, Plaintiff presented to the Orthopedic Clinic at St. Vincent Mercy Medical Center upon referral from Dr. Ware.  (Tr. 246.)  Dr. Frank E. Jaeblon, D.O., attended Plaintiff and reported the following.  Plaintiff reported that she suffered knee, ankle, and low back pain; and her left ankle and back pain gave her the most trouble.  (Tr. 246.)  She did not suffer wrist pain.  (Tr. 246.)  She tried Mobic and

5

Celebrex medications but they provided her with minimal relief.  (Tr. 246.)  She also tried Naprosyn.  (Tr. 246.)  Her ankle and back pain became worse when she was standing, and lessened when she sat or lied down.  (Tr. 246.)  She leaned on shopping carts when she went grocery shopping to provide some relief of her pain, and resting also relieved her pain.  (Tr. 246.)

After x-rays and a physical examination, Dr. Jaeblon reported the following.  The x-ray of Plaintiff's back indicated "degenerative changes with mild degenerative scoliosis," and "facet degenerative changes with spinal stenosis," but otherwise showed no acute degenerative processes.  (Tr. 247.)  X-rays of Plaintiffs knees and ankles also showed mild degenerative changes.  (Tr. 247.)  Dr. Jaeblon assessed Plaintiff with degenerative joint disease in her ankles and knees, lumbar stenosis, and "degenerative changes of the lumbar spine."  (Tr. 247.)  Dr. Jaeblon recommended that Plaintiff undergo physical therapy and lose weight; and indicated that Plaintiff might be a candidate for injections at a later date, but deferred such treatment until after Plaintiff attempted physical therapy.  (Tr. 247.)

On June 14, 2005, state agency reviewing physician Teresita C. Cruz, M.D., performed a physical RFC assessment of Plaintiff.  (Tr. 219-26.)  Dr. Cruz reported the following.  Plaintiff could occasionally lift 20 pounds; frequently lift ten pounds; and sit, stand, and walk for about six hours in an eight-hour work day.  (Tr. 220.)  Plaintiff had no limitations in her ability to push and pull, except to the extent that she was limited in lifting and carrying.  (Tr. 220.)  Plaintiff could frequently climb ramps and stairs, and occasionally climb ladders, ropes, and scaffolds.  (Tr. 221.)  Plaintiff had no manipulative, visual, and communicative limitations.  (Tr. 222-23.)

6

Although Dr. Cruz checked a box indicating that Plaintiff had no limitations in her ability to tolerate fumes, odors, dusts, gases, and poor ventilation, Dr. Cruz subsequently explained that Plaintiff "should avoid working in areas where ventilation is poor, or contaminated with dust, gases or fumes" because Plaintiff had a history of asthma.  (Tr. 223.)

On October 11, 2005, state agency reviewing physician Cindi Lynn Hill, M.D., reviewed and affirmed Dr. Cruz's findings.  (Tr. 226.)

On June 28, 2005, Plaintiff presented to Dr. Sanford R. Kimmel, M.D., at the Community Care Clinic with continued complaints of asthma and ankle, knee, and back pain.  (Tr. 280.)  Dr. Kimmel indicated that Plaintiff reported that her ankle and knee pain was worse at night after standing all day, but that Albuterol and Allegra helped Plaintiff with her breathing.  (Tr. 280.)  Dr. Kimmel prescribed Plaintiff Albuterol and Allegra for her asthma and Naproxen for her pain.  (Tr. 280.)

On July 13, 2005, Plaintiff presented to Dr. Jaeblon for a follow-up and to have Dr. Jaeblon fill out forms for the Ohio Department of Jobs and Family Services ("DJFS").  (Tr. 235.)  Dr. Jaeblon reported the following.  Plaintiff continued to complain of left ankle and back pain.  (Tr. 235.)  Plaintiff did not engage in physical therapy or visit a dietician as Dr. Jaeblon had recommended because Plaintiff could not afford those programs.  (Tr. 235.)  The Celebrex helped Plaintiff, so Plaintiff requested more samples.  (Tr. 235.)  Plaintiff's back pain at 7 out of 10 in severity.  (Tr. 235.)  Plaintiff sometimes visited a swimming pool, and swimming helped relieve her pain.  (Tr. 235.)  Plaintiff also had tried cortisone injections in her left knee that helped with her pain.  (Tr. 235.)

7

Despite mild swelling and tenderness in Plaintiff's left ankle and tenderness to palpation in her lower back, Plaintiff exhibited normal range of motion in the ankles, knees, and lower back. (Tr. 235.)  Dr. Jaeblon again assessed Plaintiff with degenerative joint disease of the knees and ankles, chronic low back pain, and lumbar stenosis caused by degenerative joint disease.  (Tr. 235.)  Dr. Jaeblon continued Plaintiff on Celebrex and gave her more samples.  (Tr. 235.)  Dr. Jaeblon also prescribed Plaintiff to physical therapy, which was to be attended two to three times a week for six to eight weeks, and was to include aquatics, strengthening, and stretching. (Tr. 235.)  Dr. Jaeblon informed Plaintiff of community programs that would provide Plaintiff with transportation to and from her physical therapy.  (Tr. 235.)  Finally, Dr. Jaeblon indicated that he filled out the forms for the DJFS and would mail them to Plaintiff.  (Tr. 235.)  The record does not appear to contain Dr. Jaeblon's forms for the DJFS.

On July 14, 2005, a staff person at Dr. Jaeblon's office reported that Plaintiff called Dr. Jaeblon's office and expressed that she was "upset" that Dr. Jaeblon had indicated in his forms to the DJFS that Plaintiff was "employable."  (Tr. 238.)  The staff person reported that Plaintiff said "she can't stand or sit at a job."  (Tr. 238.)  The staff person further reported that Plaintiff's call was brought to Dr. Jaeblon's attention, and that Dr. Jaeblon reiterated that Plaintiff was "employable" and that no changes would be made to his paperwork.  (Tr. 238.)

On July 18, 2005,  a staff person at Dr. Jaeblon's office reported that Plaintiff called again and was "very upset" because she was losing her food stamps; Plaintiff also denied that she could stand for eight hours as Dr. Jaeblon had indicated.  (Tr.

8

238.)  The staff person indicated that Dr. Jaeblon approved that a note be written indicating that Plaintiff required a sit-stand option and breaks during the work day.  (Tr. 238.)  The record does not appear to contain Dr. Jaeblon's note.

On August 9, 2005, Plaintiff presented to the Community Care Clinic with continued complaints of left knee pain and back pain.[2]  (Tr. 273.)  Plaintiff reported that she suffered her back pain since November 2004; that it was moderate in severity; that it worsened with standing and walking, or with sitting for longed periods of time; and that the pain sometimes radiated down her legs.  (Tr. 273.)  Plaintiff further reported that her knee pain was not as bad as her back pain; that the Naproxen that she had been prescribed helped with her knee pain but not her back pain; and that she had trouble sleeping at night and sometimes woke up gasping for air.  (Tr. 273.)

The person who examined Plaintiff assessed Plaintiff as follows.  Plaintiff had "pre-diabetes," and needed to diet and exercise, lose weight, and consider oral hypoglycemics.  (Tr. 274.)  Plaintiff's back pain was "disabling," and Vioxx, Celebrex, and NSAIDs did not alleviate the pain.  (Tr. 274.)  Plaintiff also "most likely suffers from obstructive sleep apnea."  (Tr. 274.)

On September 27, 2005, Plaintiff presented to Dr. Larry W. Johnson, M.D., at the Community Care Clinic.  (Tr. 269-72, 275.)  Dr. Johnson reported the following. Plaintiff reported that she was depressed, slept poorly, could not sit without back pain, and could not walk without knee pain.  (Tr. 269.)  Her back pain began three years prior, had spread to her left ankle and knee, and began to spread to her right ankle and

---

[2] The record does not clearly indicate who examined Plaintiff at this visit, as what appears to be a signature at the bottom of the page is illegible.  (*See* Tr. 273.)

knee.  (Tr. 271.)  Plaintiff also suffered pain of variable severity in her left shoulder.  (Tr. 271.)  Naproxen, Vioxx, and Celebrex did not alleviate Plaintiff's pain.  (Tr. 272.)

Plaintiff reported that she suffered seasonal allergies and asthma since the age of 25 that became worse with emotional stress (Tr. 272), but Dr. Johnson felt that her history was "uncompelling for more asthma meds" and advised her to continue taking Albuterol.  (Tr. 270.)

Dr. Johnson reported that Plaintiff was tearful about losing food stamps at the end of the month and asked Dr. Johnson to give her "an excuse for this month."  (Tr. 269.)  Dr. Johnson wrote on an undated prescription notepad that Plaintiff was "not able to work for a month (because of medical conditions), unless 1. door to door taxicab service" and "2. job where she does no heavy lifting & can choose when she sits & when she walks."  (Tr. 277.)

On November 1, 2005, Plaintiff presented to Dr. Thomas J. Tafelski, D.O., at the Community Care Clinic.  (Tr. 263.)  Resident physician D. Zachary Adams, M.D., evaluated Plaintiff and noted that Plaintiff suffered hyperlipidemia, hypertension, chronic joint pain, and depression or anxiety.  (Tr. 264.)  However, Dr. Adams determined that Plaintiff's physical examination was "not conclusive," and recommended Plaintiff continue to take her medications.  (Tr. 264.)  Dr. Tafelski oversaw Dr. Adams and concurred with Dr. Adams' assessment and plan.  (Tr. 264.)

Also on November 1, 2005, Dr. Tafelski filled out physical RFC form for the DJFS.  (Tr. 227-28.)  Dr. Tafelski assessed Plaintiff's as follows.  Plaintiff suffered hyperlipidemia, osteoarthritis, depression or anxiety, and hypertension.  (Tr. 227.)  Plaintiff could sit, stand, and walk for four hours in an eight-hour workday without

interruption.  (Tr. 228.)  Plaintiff could lift and carry between 21 and 25 pounds both
frequently and occasionally; was moderately limited in her abilities to bend, reach,
handle, and perform repetitive foot movements; and was not limited in any other area of
physical functioning.  (Tr. 228.)  However, Dr. Tafelski checked off boxes on the form
indicating that Plaintiff was "unemployable" for "12 months or more."  (Tr. 228.)  Dr.
Tafelski noted that he saw Plaintiff only once, and that his answers to the questions on
the form were based on Plaintiff's medical history and Dr. Tafelski's physical
examination of Plaintiff.  (Tr. 228.)

On November 29, 2005, Plaintiff presented to Dr. Kimmel at the Community
Care Clinic.  (Tr. 266.)  Dr. Kimmel reported the following.  Plaintiff continued to
complain of chronic pain in her back, left ankle, left knee, and left shoulder.  (Tr. 266.)
Plaintiff reported her pain was stable after taking Ibuprofen; that her anxiety had
improved after taking Zoloft; and that she continued to use her Albuterol inhaler but
continued to smoke.  (Tr. 266.)  Plaintiff's left shoulder was tender to palpitation over
the deltoid and had diminished range of motion.  (Tr. 266.)  Dr. Kimmel recommended
that Plaintiff continue taking her medications, eat smaller portions, exercise, and quit
smoking.  (Tr. 266.)

Plaintiff followed up at the Community Care Clinic from January and through
April 2006 with similar complaints, evaluations, and treatments as before.  (*See* Tr. 254-
44, 257, 259.)

On July 21 and 23, 2006, Plaintiff underwent a counseling and assessment at

Rescue Mental Health Services, Central Access.[3]  (Tr. 200-09.)  Plaintiff was diagnosed

with major depression (Tr. 207, 204) and generalized anxiety disorder (Tr. 207), and

was assigned a Global Assessment of Functioning ("GAF") score of 35 and 40,[4]

respectively (Tr. 207, 204).

On July 24, 2006, Plaintiff presented to Harbor Behavioral Healthcare upon

referral from Rescue Mental Health Services, Central Access.  (Tr. 211.)  Mr. Jeremy

Stiles, B.A., performed an intake assessment of Plaintiff with oversight by Ms. Janet

Overmyer, PCC, LICDC.  (Tr. 215.)  Mr. Stiles diagnosed Plaintiff with a major

depressive disorder that was recurrent and severe and had psychotic features, and

post-traumatic stress disorder.  (Tr. 215.)  Mr. Stiles assigned Plaintiff a GAF score of

53.[5]  (Tr. 125.)

On August 9, 2006, Dr. Jaylata Patel, M.D., appears to have performed a

psychiatric evaluation of Plaintiff at Harbor Behavioral Healthcare (the assessment was

not signed or dated by Dr. Patel, although her name was typed under a signature block

_____

[3] The record does not clearly indicate who examined Plaintiff at these visits, as
the signatures on the assessment forms are illegible.  (*See* Tr. 208, 204.)

[4] A GAF score between 31 and 40 indicates some impairment in reality testing or
communication or major impairment in several areas such as work or school,
family relations, judgment, thinking, or mood.  A person who scores in this
range may have illogical or irrelevant speech, and may avoid friends, neglect
family, and be unable to work.  *See Diagnostic and Statistical Manual of Mental
Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

[5] A GAF score between 51 and 60 indicates moderate symptoms or moderate
difficulty in social, occupational, or school functioning.  A person who scores in
this range may have a flat affect, occasional panic attacks, few friends, or
conflicts with peers and co-workers.  *See Diagnostic and Statistical Manual of
Mental Disorders*, *supra*, at 34.

on the last page of the evaluation form).  (Tr. 216-28.)  Dr. Patel appears to have

diagnosed Plaintiff with a depressive disorder and assigned Plaintiff a GAF score of

between 55 and 60.  (Tr. 217-18.)  Plaintiff continued to present to Harbor Behavioral

Heathcare until June 11, 2007, and the records indicate that Plaintiff's condition

remained essentially the same throughout that time.  (*See* Tr. 145-46.)

On September 18, 2006, Plaintiff presented to Dr. Ronald Williams, M.D., at

Neighborhood Health Association with complaints of "[a]rthritis all over body, pain in

shoulders, left knee, back, LS spine region, neck."  (Tr. 178.)  Dr. Williams indicated

that Plaintiff reported that she took Motrin for her pain, but it did not help her.  (Tr. 178.)

Dr. Williams noted that Plaintiff's physical examination was normal other than

tenderness in Plaintiff's low back, crepitus, and synovitis (inflammation) in her knees

and ankles.  (Tr. 178.)  Dr. Williams assessed Plaintiff with "[o]steoarthritis all over," and

planned to give her more Motrin, as well as Ultram, and submit Plaintiff to x-rays.  (Tr.

178.)

On October 2, 2006, Plaintiff underwent an x-ray evaluation performed and

interpreted by Dr. Hassan Semaan, M.D.  (Tr. 183-84, 196-97.)  The x-rays showed

mild degenerative changes in Plaintiff's cervical spine; levoscoliosis in her lumbar spine

with moderate disc narrowing at L4-5 and degenerative changes in the facet joints at

L3-4 and L4-5; mild degenerative changes in both knees; mild degenerative changes in

her left shoulder; and essentially no arthritis or acute bony abnormality in her right

shoulder.  (Tr. 183-84, 188.)

Plaintiff presented to Dr. Williams on several more occasions between October

2006 and May 2007 primarily for medication management.  (Tr. 174-77.)

13

On April 13, 2007, Plaintiff underwent an additional x-ray evaluation performed and interpreted by Dr. Jacob Zeiss, M.D.  (Tr. 194-95.)  The x-rays again showed only mild degenerative arthritis with small joint effusion in Plaintiff's knees, and no acute bony abnormalities or arthritis in the shoulders.  (Tr. 194-95.)

On September 18, 2007, Plaintiff presented to Dr. Carlos A. Decarvalho, M.D., upon referral from Dr. Madhusudan F. Patel, M.D., for an electroneuromyographic examination of Plaintiff's hands.  (Tr. 140.)  Dr. Decarvalho indicated that Plaintiff reported a "vague history" of symptoms of pain, numbness, and tingling in her hands. (Tr. 140.)   Upon testing, Dr. Decarvalho diagnosed Plaintiff with moderate carpal tunnel syndrome in the left hand.  (Tr. 140-41.)

Also on September 18, 2007, Plaintiff underwent an x-ray examination of her back.  (Tr. 142.)  Dr. Gerald B. Glassberg, M.D., read the results of the x-rays and indicated that, aside from slight scoliosis in Plaintiff's lumbar spine, there were no acute abnormalities.  (Tr. 142.)

On October 29, 2007, registered nurse Ms. Lori Wilmarth, MSN, APRN, from Harbor Behavioral Healthcare, wrote a note referring to Plaintiff and indicating that she was making a change to Plaintiff's mental functional capacity assessment to provide that she found Plaintiff unemployable, and that Plaintiff's mental limitations were expected to last for twelve months or more.[6]  (Tr. 124.)

On November 6, 2007, Dr. James C. Tanley, Ph.D., performed a Clinical Interview of Plaintiff upon referral from the Bureau of Disability Determination.  (Tr. 125-

---

[6] The record does not appear to contain the original mental functional capacity assessment from Harbor Behavioral Healthcare.

31.)  Dr. Tanley reported the following.  Plaintiff reported that she suffered arthritis, depression, and carpal tunnel syndrome.  (Tr. 125.)  She was last employed in 2004 as a cashier, and she did not remember why she stopped working at that time.  (Tr. 125.)  She performed all her household chores, but not every day as the level of her activity depended on how much pain she was in.  (Tr. 126.)  She had no hobbies.  (Tr. 126.)

Dr. Tanley reported that Plaintiff's performance on mental status testing fell within the Mild range of Mental Retardation.  (Tr. 127.)  He noted, however, that Plaintiff completed the eleventh grade of high school, and that such poor performance could be attributed to over-reporting and an inability to read.[7]  (Tr. 127.)  Dr. Tanley opined that Plaintiff's ability to relate to others was not impaired; her ability to understand and follow simple instructions was moderately impaired; her ability to maintain attention to perform simple, routine tasks was moderately impaired; and her ability to withstand the stress and pressure of daily work was moderately impaired.  (Tr. 127.)  Dr. Tanley diagnosed Plaintiff with a depressive disorder and assigned Plaintiff a GAF score of 60.  (Tr. 128.)

On December 6, 2007, Plaintiff presented to Toledo Pain Services upon referral from Dr. George Jablay, M.D., for an opinion on Plaintiff's lumbar pain.  (Tr. 120.)  Dr. Nadeem Moghal, M.D., examined Plaintiff and assessed Plaintiff as follows.  Plaintiff had moderate tenderness in the midline lumbar area, but otherwise had "[f]ull, painless range of motion of the thoracic and lumbar spine," with normal stability, strength, and tone.  (Tr. 122.)  Plaintiff's muscle strength in her legs was rated at 5 out of 5, and muscle tone and bulk was normal.  (Tr. 122.)  Plaintiff's deep tendon reflexes were

---

[7]  Dr. Tanley also noted that the hypothesis that Plaintiff had actually over-reported was not supported.  (Tr. 127.)

normal and symmetrical, and Plaintiff had a negative straight leg test.  (Tr. 122.)  Dr. Moghol concluded that Plaintiff suffered displacement of lumbar intervertebral discs, lumbrosacral spondylosis without myelopathy, and unspecified myalgia and myositis. (Tr. 122.)  However, Dr. Moghol opined that Plaintiff's "[b]ehaviors are exaggerated in context of disease."  (Tr. 122.)

Dr. Moghal recommended that Plaintiff "reduce the misuse, overuse, or dependency on medications . . . [r]educe the use of invasive medical procedures . . . [m]aximize and maintain optimal physical activity and function . . . [and] [r]eturn to productive activity at home, socially, and/or at work."  (Tr. 122-23.)  Dr. Moghal further prescribed Plaintiff "Lyrica for fibromyalgia," scheduled an epidural injection for Plaintiff's lower back, and ordered physical therapy.  (Tr. 123.)

Plaintiff presented to Dr. Moghol several times between December 6, 2007, and March 14, 2008.  (*See* Tr. 103-118.)  During Plaintiff's follow-up visit with Dr. Moghal on January 14, 2008, Dr. Moghal reported the following.  Plaintiff reported that she never attended physical therapy and was not interested in physical therapy because of "transportation issues."  (Tr. 110.)  Moreover, she was not interested in any additional epidural injections because her prior two injections had not resulted in a significant improvement in pain.  (Tr. 110.)  Plaintiff did, however, report "dramatic improvement in her pain overall" after starting Lyrica, and indicated that Vicodin improved her pain control.  (Tr. 110.)  Dr. Moghol's assessment of Plaintiff during subsequent visits remained essentially the same.  (*See* Tr. 103-118.)

On March 6, 2008, Plaintiff underwent another x-ray examination of her back upon referral from Dr. Moghal.  (Tr. 106.)  Dr. Stephen Stoll, M.D., interpreted the x-ray

16

and reported that there were degenerative changes at L4-5 and "a very small left intraforaminal disc protrusion at L4-5 which touches the exiting left L4 nerve root without definite compression at the root."  (Tr. 106.)

### C.    Plaintiff's Hearing and Other Testimony

In paperwork that Plaintiff submitted in connection with her disability applications, Plaintiff explained that her prior job as a factory crew leader required 10 hours of work per day, six days per week; required 9 hours of walking, standing, stooping, reaching, and handling/grabbing/grasping large objects per day; required 2 hours of writing, typing, or handling small objects per day; and required lifting up to ten pounds frequently.  (Tr. 81.)  Plaintiff further explained that the job required the use of machines, tools, and equipment; required technical knowledge and skills; and required writing reports and completing forms.  (Tr. 81.)

At her administrative hearing, Plaintiff testified as follows.  Plaintiff is able to stand and walk for only five or ten minutes and requires the support of a grocery cart. (Tr. 342.)  She has trouble lifting and holding onto objects because her hands become numb.  (Tr. 342.)  She also has pain in her right hand (Tr. 342), although her right hand is not as bad as her left hand (Tr. 344).  When she sits, her back and legs hurt, and her legs become numb.  (Tr. 343.)  She is able to sit for about half an hour at a time, and then she needs to stand up and move around for 15 minutes before she needs to sit again.  (Tr. 343.)  Plaintiff is also depressed and obtains help from "Rescue Crisis" and "Harbor."  (Tr. 341.)  Plaintiff quit her last job as a cashier in 2004 because she suffered pain while at work and, although she tried to cope with it, she needed to take days off and eventually decided she needed to quit.  (Tr. 340.)

17

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her

18

past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and

416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

prevent her from doing her past relevant work, if other work exists in the national

economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§

404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social
      Security Act through September 30, 2008.

2.    The claimant has not engaged in substantial gainful activity since
      November 1, 2004, the amended alleged onset date.

3.    The claimant has the following severe impairments:  degenerative
      disc disease, degenerative joint disease, and obesity.

4.    The claimant does not have an impairment or combination of
      impairments that meets or medically equals one of the listed
      impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds
      that the claimant has the residual functional capacity to perform light
      work . . . except that the claimant can never climb ladders, ropes, or
      scaffolds.  However, she can frequently climb ramps and stairs.

6.    The claimant is capable of performing past relevant work as a crew
      leader.  This work does not require the performance of work-related
      activities precluded by the claimant's residual functional capacity.

7.    The claimant has not been under a disability, as defined in the Social
      Security Act, from November 1, 2004, through the date of this
      decision.

(Tr. 12-23.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Social Security*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    The ALJ's Determination that Plaintiff Could Perform Her Past Relevant Work

Plaintiff argues that the ALJ erred in determining that Plaintiff could perform her

past relevant work because the ALJ failed to make specific findings of fact required by Social Security Ruling 82-62.  The Court agrees.  Social Security Ruling 82-62 provides that, in finding that a claimant has the capacity to perform her past relevant work, the decision must contain, among other findings:  (1) a finding of fact as to the individual's RFC; (2) a finding of fact as to the physical and mental demands of the claimant's past work at issue; and (3) a finding of fact that the individual's RFC would permit a return to his or her past work.  S.S.R. 82-62, 1982 WL 31386, at *4; *Branch v. Astrue*, No. 4:10-cv-485, 2010 WL 5116948, at *8-9 (N.D. Ohio Dec. 9, 2010); *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001).  Here, the ALJ made findings of fact as to Plaintiff's RFC (Tr. 18) and that Plaintiff's RFC would permit Plaintiff to return to her past work as a factory crew leader (Tr. 23).  The ALJ did not, however, make any findings of fact as to the physical and mental demands of Plaintiff's past work as a factory crew leader.  Absent such a finding, the Court is unable to review the ALJ's decision and determine whether it is supported by substantial evidence.  Accordingly, remand is necessary so that findings of fact may be made as to the physical and mental demands of Plaintiff's past work as a factory crew leader.

Although the ALJ's failure to make findings of fact as to the physical and mental demands of Plaintiff's past work as a factory crew leader is alone a basis for remand, the Court will address Plaintiff's other assignments of error for guidance in any subsequent proceedings.

### C.    The ALJ's Step Two Determination of Severe Impairments

Plaintiff argues that the ALJ erred by failing to find Plaintiff's carpal tunnel syndrome a severe impairment, particularly by failing to determine whether Plaintiff's

carpal tunnel syndrome would be expected to last for a continuous period of at least twelve months.  For the following reasons, the Court finds that this argument lacks merit.

An impairment may be "severe" when it has *more than* a minimal effect on a claimant's ability to perform work regardless of age, education, and experience.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  The ALJ's assessment of whether Plaintiff's carpal tunnel syndrome constituted a severe impairment is as follows:

> Dr. Decarvalho's examination did not reveal any associated weakness, and there is no record of treatment following the diagnosis.  Not only does the evidence fail to support that this impairment would have more than a minimal effect on the claimant's ability to perform work activity, given the apparent recent onset of symptoms, this condition fails to satisfy the 12-month functional requirement under the Regulations.  As such, it is determined that this is not a severe impairment.

(Tr. 13.)  Because the ALJ determined that the evidence failed to support that Plaintiff's carpal tunnel syndrome would have more than a minimal effect on the claimant's ability to perform work activity, the question of whether the impairment would last for more than twelve months is moot.

Furthermore, any defect in the ALJ's consideration of whether Plaintiff's carpal tunnel syndrome was a severe impairment would be harmless error here.  Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs*, 880 F.2d at 862, the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments, or combinations of impairments,

22

as severe would be only harmless error because step two would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).  However, all of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process.  *See* C.F.R. § 404.1529(d); C.F.R. §§ 416.920(d).

Here, the ALJ found that Plaintiff suffered the following severe impairments: degenerative disc disease degenerative joint disease, and obesity.  Upon these findings, Plaintiff cleared step two of the analysis.  *See Anthony*, 266 F. App'x at 457.  Any defect in the ALJ's assessment of Plaintiff's carpal tunnel syndrome at step two of his analysis would be, at most, harmless error.  *See id.* (citing *Maziars*, 837 F.2d at 244).  Accordingly, this assignment of error lacks merit.

> **D.  The ALJ's Analysis of the State Agency Reviewing Physicians' Opinion of Plaintiff's Environmental Limitations**

State agency reviewing physician Dr. Cruz checked a box on her evaluation form indicating that Plaintiff had no limitations in her ability to tolerate fumes, odors, dusts, gases, and poor ventilation and subsequently explained that Plaintiff "should avoid working in areas where ventilation is poor, or contaminated with dust, gases or fumes" because Plaintiff had a history of asthma.  (Tr. 223.)  State agency reviewing physician Dr. Hill reviewed and affirmed these findings.  (Tr. 226.)  The ALJ addressed these opinions as follows:  "The state agency noted the claimant's history of asthma, but it assigned no significant environmental limitations."  (Tr. 22.)  In his RFC determination, the ALJ did not include any limitations in Plaintiff's ability to work in areas with poor ventilation, dust, gases, or fumes.  Plaintiff argues that the ALJ's failure to include such

23

limitations in his RFC determination was harmful error.  The Court disagrees.  Dr. Cruz's opinion does not indicate that Plaintiff *cannot* work in an environment with poor ventilation, dust, gases, or fumes.  The ALJ's RFC determination is consistent with Dr. Cruz's opinion that Plaintiff has no environmental limitations even though it might be preferable that Plaintiff avoid areas with poor ventilation, dust, gases, or fumes. Accordingly, this assignment of error lacks merit.

> **E.    The ALJ's Analysis of Plaintiff's Treating Physicians' Opinions**

Plaintiff argues that the ALJ failed to give controlling weight to the opinions of two of Plaintiff's treating physicians, Drs. Tafelski and Jaeblon, and failed to give good reasons for giving their opinions less than controlling weight.  For the following reasons, the Court finds that Plaintiff's assignment of error as to Dr. Tafelski lacks merit, but that Plaintiff's assignment of error as to Dr. Jaeblon supports remand.

Generally, an ALJ must give controlling weight to the opinion of a treating physician when the opinion is well-supported by clinical and laboratory findings and is not inconsistent with other substantial evidence.  20 C.F.R. § 416.927(d); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); S.S.R. 96-2p, 1996 WL 374188, at *1. Plaintiff's arguments that the ALJ erroneously failed to give Dr. Tafelski's opinions controlling weight as well-supported opinions of a treating physician, or failed to give good reasons for giving Dr. Tafelski's opinions less than controlling weight, lack merit because Dr. Tafelski is not a treating physician.

A treating source is a claimant's own physician, psychologist, or other acceptable medical source who provides the claimant, or has provided the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship

with the claimant.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006) (quoting 20 C.F.R. § 404.1502).  Generally, one visit with a physician is not enough to establish an ongoing treatment relationship.  *See Kornecky,* 167 F.App'x at 506-507 (noting that "a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship," and that, "depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship"); *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 491 (6th Cir. 2005) (finding that a physician who saw the claimant two times for his back pain did not qualify as a treating source).  Dr. Tafelski indicated that he evaluated Plaintiff only once; therefore, Dr. Tafelski does not qualify as a treating physician and any failure to accord Dr. Tafelski's opinions controlling weight or to give good reasons for giving the opinions less than controlling weight on that basis would not be error.

Dr. Jaeblon, however, appears to be a treating physician.  A staff person from Dr. Jaeblon's office indicated in a call log that, after Plaintiff called Dr. Jaeblon's office twice to complain about Dr. Jaeblon's opinion that Plaintiff was employable, Dr. Jaeblon reluctantly approved a change to his evaluation to provide the opinion that Plaintiff required a sit/stand option and breaks throughout the day for any job Plaintiff might perform.  The ALJ noted that "[e]ven after adding that the claimant required switching positions and taking breaks during the day, these additional limitations would not impose significant work-related limitations."  (Tr. 21.)  The ALJ failed to include Dr. Jaeblon's limitations in his RFC determination, which suggests that the ALJ rejected Dr. Jaeblon's opinions.  Furthermore, the ALJ did not provide any basis for his conclusion

that a sit/stand option and breaks throughout the day would not impose significant work-related limitations—particularly in relation to Plaintiff's past relevant work as a factory crew leader.  Therefore, the Court concludes that the ALJ failed to provided good reasons—indeed, any explanation—for the weight he gave Dr. Jaeblon's opinions.  On remand, the ALJ should more clearly explain the weight he gave Dr. Jaeblon's opinions and the reasons for that weight.

**F.    Whether a Sentence Six Remand is Appropriate**

Plaintiff argues that remand is appropriate under sentence six of 42 U.S.C. § 405(g) to consider evidence that Plaintiff submitted to the Appeals Council that was not submitted to the Social Security Administration in prior proceedings, and that allegedly supports the conclusion that Plaintiff suffers disabling carpal tunnel syndrome.  The Court disagrees.

A court may remand a case for consideration of additional evidence under sentence six only where there is a showing that the evidence is new and material and there is good cause for the failure to include it in the prior proceeding.  42 U.S.C. § 405(g); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  Plaintiff offers pre-operative and post-operative instructions from The University Medical Center, University of Toledo, indicating that Plaintiff was scheduled for a left carpal tunnel release and left ulnar nerve transposition on April 22, 2009.  (Tr. 332-35.)  Plaintiff has failed to persuade the Court that this evidence is material.

Evidence is "material" only if there is a reasonable probability that the Commissioner would have reached a different conclusion on the claimant's disability claim if presented with the new evidence.  *Foster*, 279 F.3d at 357.  It is not reasonably

26

probable that the Commissioner would have reached a different conclusion if Plaintiff's pre- and post-operative instruction forms were considered with the rest of the record evidence because those forms say nothing about the nature and severity of Plaintiff's carpal tunnel syndrome, either before or after any alleged surgery.  Indeed, the instruction forms do not even verify whether Plaintiff actually underwent such surgery. Accordingly, there is no basis for a sentence six remand.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED and that this case be REMANDED for further proceedings consistent with this report and recommendation.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: July 27, 2011

## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of this notice.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**

27